FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

98 SEP 30 PM 12: 17

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| BARBARA FROST, et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CV 95-PT-1252-S |
| | ) | |
| SEARS, ROEBUCK and CO., | ) | |
| | ) | |
| Defendant. | ) | |

ENTERED
SEP 30 1998

| | | |
|---|---|---|
| BARBARA FROST, et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CV 95-PT-1850-S |
| vs. | ) | |
| | ) | |
| SEARS, ROEBUCK and CO., | ) | |
| | ) | |
| Defendant | ) | |

Memorandum Opinion

This cause comes on to be heard on a motion for summary judgment filed by defendant Sears, Roebuck and Co. ("Sears") on June 9, 1998. In its motion the defendant contends that the plaintiff cannot raise a genuine issue of triable fact on its claims, all of which involve the propriety of the Sears's choice to characterize as a financed amount (or "amount financed") the cost of its extended service contracts ("service

contracts") covering merchandise purchased by the plaintiffs on credit from Sears. By characterizing the cost of the service contract as a portion of the amount financed, the cost of each service contract was included in the principal upon which credit was extended and on which interest would be charged. However, the plaintiffs contend that the service contracts were a form of insurance issued incident to the extension of credit and should have been treated as a finance charge, i.e., a charge on the extension of credit, not counted as part of the principal and on which no interest can be calculated. From Sears's inclusion of the service contracts as an amount to be financed, the plaintiffs' aver several consequences ensue, including, (1) that the defendant violated §§ 5-19-1 & 5-19-20 of the Code of Alabama excluding certain types of insurance from being treated as an amount financed; (2) that the defendant knowingly misrepresented, fraudulently misrepresented, and willfully deceived plaintiffs as to the material fact that the cost of its extended service contracts was part of the total amount being financed; (3) that the defendant fraudulently misrepresented and suppressed the material fact that it was licensed to sell insurance and receive commissions for the insurance under the law of Alabama; and (4) that the defendant deliberately or recklessly charged the plaintiffs commissions on insurance in excess of that permitted by § 5-19-19 of the Code of Alabama. The defendant asserts that the plaintiffs' claims all hinge on the twin issues of whether the extended service contracts constituted insurance under Alabama law and whether the cost of each extended service contract was properly characterized as an amount to be financed by the extension of credit rather than as a finance charge incident to the extension of that credit.

On a motion for summary judgment, the court must assess the proof to ascertain whether there is a genuine need for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is appropriate only if this court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party seeking summary judgment bears the initial responsibility of informing this court of the grounds for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. Id. at 323. Once the moving party has met this burden, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 523 (11th Cir. 1994). Rule 56(e) requires the nonmoving party to go beyond the pleadings and by affidavits, or by the depositions, answers to interrogatories, and admissions on file designate specific facts showing there exist genuine issues for trial.

2

Celotex, 477 U.S. at 324; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). The court may consider the offered "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any..." in deciding whether to grant or deny a summary judgment motion. FED. R. CIV. P. 56(c). In resolving whether a given factual dispute requires submission to a jury, the court must view the presented evidence through the looking glass of the substantive evidentiary burden. Anderson, 477 U.S. at 254-55. The court, however, must avoid weighing conflicting evidence for probity or making credibility determinations. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992). "It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather decide whether such issues exist to be tried. The Court must avoid weighing conflicting evidence or making credibility determinations." Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913, 919 (11th Cir. 1993). "The nonmoving party must provide more than a mere scintilla of evidence to survive a motion for judgment as a matter of law; 'there must be a substantial conflict in evidence to support a jury question.'" Tidwell v. Carter Products, --- F.3d ---, 1998 WL 80143 at *3 (citing Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir.1989)).

In light of the above, this court must canvass the evidence to determine if there is a genuine issue of material fact.

### Facts

The facts common to all plaintiffs are that they were sold merchandise by Sears on credit. In addition to the merchandise, the plaintiffs were sold extended service contracts on the merchandise. The extended service contracts required Sears to "furnish parts and service necessary to maintain the proper operating condition" of the merchandise purchased, to provide yearly preventive maintenance, upon request of the owner, and to provide the merchandise owner with a comparable product in the event that repair was not possible. As part of the finance agreement into which each plaintiff entered, the cost of the extended service contract was added to the cost of the merchandise itself in order to derive a total amount to be financed. As a result, the plaintiffs were required to pay interest on the cost of the service contracts.

Contentions & Analysis

Without explaining precisely why, the parties have agreed that the claims in this action hinge on whether the service contracts at issue were a form of insurance. Apparently, if the service contracts are insurance, Sears is obligated to follow § 5-19-20 in providing the service contract when financing the purchase of merchandise. Prior to May 20, 1996, the plaintiffs argue, the cost of insurance provided by Sears could not exceed the premium of the insurance. However, the plaintiffs reason, because it was treated as an amount to be financed, the premium on service contracts included not only the mere cost of those service contracts, but any interest on the credit extended to cover the cost of the service contracts. Because of this limitation on the ability of Sears to increase the cost of insurance provided to debtors above the premium, it was impermissible for the premiums to be treated as a portion of the amount financed. Therefore, in treating the cost of the service contracts as an amount financed, the defendant allegedly misrepresented the amount that the plaintiffs were required to pay for credit and, in fact, overcharged them for the extension of the credit. In addition, argue the plaintiffs, because the service contracts are forms of insurance, Sears misrepresented that it was authorized and licensed to collect commissions on the sales of the insurance. Finally, because the alleged insurance premiums were treated as finance charges, their treatment rendered them excessive in violation of § 5-19-19. The defendant argues that because the service contracts are not insurance, none of the deleterious effects outlined by the plaintiffs follow. Sears also argues that, even if the service contracts are a form of insurance, those contracts are nonetheless properly characterized as an amount financed rather than as a finance charge.

DEFINING INSURANCE.

Although on May 20, 1996, the Alabama Legislature explicitly excluded service contracts from the definition of insurance, see § 5-19-32 of the Alabama Code of 1975, under previous Alabama law it was uncertain whether service contracts constituted insurance. The parties offer a host of conditions, the utilization of which would, averredly, lead this court to the inescapable conclusion that a service contract is or is not insurance.

A leading case in Alabama on the issue of whether a service contract constitutes a contract for insurance is Schoepflin v. Tender Loving Care Corp., 631 So.2d 909 (Ala. 1993). In Scheopflin, the plaintiff purchased a maintenance service contract from the defendant. The court noted that the contract described three coverage plans, one of which would reimburse the plaintiff up to $2000.00 in the event of a

4

mechanical failure, contained limitations on "coverage" and listed procedures for filing a "claim." When the plaintiff's car broke down, the defendant refused to pay for repair of the car, and the plaintiff filed suit, alleging, among other things, that the defendant had refused in bad faith to pay the plaintiff's insurance claim. The defendant contended that the plaintiff could not state a claim because the service contract did not constitute insurance. The Alabama Supreme Court disagreed:

> "Insurance" is defined in Ala.Code 1975, § 27-1-2(1), as "[a] contract whereby one undertakes to indemnify another or pay or provide a specified amount or benefit upon determinable contingencies." "Insurer" is defined in § 27-1-2(2) as "[e]very person engaged as indemnitor, surety or contractor in the business of entering into contracts of insurance." In Peninsular Life Insurance Co. v. Blackmon, 476 So.2d 87 (Ala. 1985), the plaintiff sued his employer, alleging a bad faith refusal to pay benefits under a supplemental temporary disability plan that had been provided by his employer as a fringe benefit. The employer paid benefits under the plan out of its general operating revenues, without withholding any premiums from the plaintiff's pay. In addition, the plan was an oral agreement; there was no written policy and no formal mechanism for evaluating claims; there were no definitions to aid in determining whether the plaintiff was entitled to recover; and the plan was not regulated by the state insurance department. This Court, ruling as a matter of law that the contract, although bearing some resemblance to an insurance contract, was not an insurance contract within the meaning of our cases defining the tort of bad faith, stated:
>> "The tort of bad faith refusal to pay a claim has heretofore been applied only in those situations where a typical insurer/insured relationship existed; that is, where the insured or his employer entered into a written contract of insurance with an insurer and premiums were paid into a central fund out of which claims were to be paid."
>
> 476 So.2d at 89. We further note that "insurance" is defined in Black's Law Dictionary (6th ed. 1990) as follows:
>> "A contract whereby, for a stipulated consideration, one party undertakes to compensate the other for loss on a specified subject by specified perils. The party agreeing to make the compensation is usually called the 'insurer' or 'underwriter'; the other, the 'insured' or 'assured'; the agreed consideration, the 'premium'; the written contract, a 'policy'; the events insured against, 'risks' or 'perils'; and the subject, right, or interest to be protected, the 'insurable interest.' A contract whereby one undertakes to indemnify another against loss, damage, or liability arising from an unknown or contingent event and is applicable only to some contingency or act to occur in [the] future. An agreement by which one party for a consideration promises to pay money or its equivalent or to do an act valuable to [the] other party upon destruction, loss, or injury of something in which [the] other party has an interest."
>
> See, also, 43 Am.Jur.2d Insurance § 1 (1982): "Broadly defined, insurance is a contract by which one party, for a compensation called the premium, assumes particular risks of the other party and promises to pay to him or his nominee a certain or ascertainable sum of money on a specified contingency."
>
> The defendant, relying on the affidavit of William Wettlaufer, an assistant vice president of the defendant, argues that it is not an insurance company and that its contract with the plaintiff bears no resemblance to an insurance contract. The plaintiff maintains, however, that the defendant, for compensation, assumed the risk that the plaintiff's automobile would sustain a mechanical breakdown and that the defendant promised to pay him a certain sum of money if a covered breakdown occurred. This, the plaintiff argues, constituted "insurance" under Alabama law. We agree with the plaintiff.

    The contract in this case was reduced to a formal document, it described three available "coverage plans," and it provided that in the event of a mechanical breakdown the defendant would pay the plaintiff for the cost of repairing or replacing certain covered parts on his new automobile. The contract also contained a specific procedure for filing "claims," as well as certain exclusions and pertinent definitions. Furthermore, the plaintiff paid a fee to the defendant in exchange for its assumption of the risk of a mechanical failure on his automobile. The defendant denies it is in the insurance business and the word "insurance" appears nowhere in the contract; however, these factors are not determinative. See 43 Am. Jur. 2d Insurance, supra, § 4:

> "Whether a corporation or association is engaged in the insurance business must be determined by the particular objects which it has in view, and not by abstract declarations of general purposes; the business which the organization is actually carrying on, rather than the mere form of the organization, is the test for determining whether it is carrying on an insurance business. The names by which a company or association, or its certificates or policies, are designated, are not determinative of the question whether the organization is an insurance company or association or its contracts are in the nature of insurance policies. Basically, insurance, whether fire, marine, or any other form, is that which the authoritative cases and the legislature define it to be.
>
> "It is immaterial, or at least not controlling, that the term 'insurance' nowhere appears in the contract the nature of which is to be determined; indeed, the fact that it states that it is not an insurance policy is not conclusive, and a company may be found to be engaged in an insurance business even though it expressly disclaims any intention to sell insurance. Neither are the terms or mode of payment of the consideration determinative of the question whether the contract is one of insurance. The nature of a contract as one of insurance depends upon its contents and the true character of the contract actually entered into or issued--that is, whether a contract is one of insurance is to be determined by a consideration of the real character of the promise or of the act to be performed, and by a consideration of the exact nature of the agreement in the light of the occurrence, contingency, or circumstances under which the performance becomes requisite, and not by what it is called."

    Based on the foregoing, we hold that the contract between the plaintiff and the defendant in this case was an insurance contract within the meaning of our cases defining the tort of bad faith and, therefore, that the defendant was not entitled to a summary judgment on the basis that it is not an insurer.

Id. at 910-12.

    The Alabama Supreme Court painted in sufficiently broad strokes to cover as insurance not only the business of insurance, but almost any act of providing insurance. The distinction is paramount to the instant case. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY defines "insurance" as:

> **2 a**: the business of insuring persons or property; <u>specif</u>: a device for the elimination or reduction of an economic risk common to all members of a large group and employing a system of equitable contributions out of which losses are paid **b** coverage by contract whereby for a stipulated consideration one party undertakes to indemnify or guarantee another against loss by a specified contingency or peril...

A business of providing insurance is a specific form of the more general concept of "insurance": For example, if A promises in exchange for a small sum to guard B's bike against theft, A has provided B with a

6

form of insurance, in the general sense — the risk of loss due to theft has, for the small sum, been transferred from B to A. Key to understanding this broad notion of insurance is that it is irrelevant how A undertakes to guard against the risk of loss, i.e., A can pocket the sum and hope for the best, paying B the full amount if B's bike is stolen or A can linger around the bike, making certain that nobody pirates it. On the other hand, if A is in the business of providing insurance, A would be relying on a pool of bike owners to provide a total amount out of which indemnification for any bike theft could be paid. In describing a business of insurance, it <u>is</u> generally relevant how A undertakes to guard against risk of loss: In the business of insurance, the risk of loss is distributed among the insured and the insurer is essentially the manager of a fund consisting of the portions of premiums from which, on a specified contingency, indemnification occurs. The group of insureds bears the risk of each individual insured's loss. In effect, then, a business of insurance is a business set up to redistribute the risk of loss among a class of insureds.

In determining whether a particular transference of risk, such as was accomplished by the service contracts in this case, is either insurance in the broad sense, or a product of the business of insurance in the more specific sense will depend on a number of factors, including the steps the "insurer" takes to guard against risk of loss, whether risk of loss is reallocated among a group of insureds or is born principally by the "insurer" himself, and whether the "insured" takes an interest in how compensation for loss is spent, i.e., whether the "insurer" is concerned with the value of the loss or the thing lost itself.[1]

<u>MS Life Ins. Co. v. Fluker</u>, 95-P-3184-S (N.D. Ala. 1997), is attentive to the distinction between insurance writ large and the business of insurance. In <u>Fluker</u>, the third-party plaintiffs, entered into a mechanical repair contract as a precondition of obtaining credit from the third-party defendants. The cost of the repair contract was included "in the 'amount financed' rather than the 'finance charge' portion of the agreement." <u>Id</u>. at 2. The third-party plaintiffs raised a claim "based upon [the defendants'] alleged misrepresentation to [the plaintiffs] that [defendants] were authorized insurers under the laws of Alabama and were authorized to collect premiums with regard to the sale of insurance products, or, alternately, upon [the defendants'] alleged suppression of the fact that [the defendants] were not authorized insurers under Alabama law." <u>Id</u>. at 5. The court dismissed the claim, stating:

---

[1] For example, a bike shop offers insurance against broken bike chains. If a chain is broken, the bike shop, rather than providing the value of the bike chain broken, instead replaces it with a bike chain of equivalent value from the shop. What the cost of the insurance goes to then, rather than a pool from which loss is indemnified, is the purchase of further chains from the shop, which the shop then "holds" until a chain is broken. The bike shop, in some sense then, profits from the purchase of additional chains under the insurance agreements, rather than (or in addition to) management of any fund from which a loss is paid.

7

> Schoepflin, which represents the state of the law at the time the [plaintiffs'] claim arose, holds only that mechanical service contracts are insurance for the purposes of supporting a bad faith tort claim, not that they are insurance contracts subject to all of Alabama's laws regulating insurance. See Schoepflin, 631 So.2d at 912. Because mechanical service contracts are not insurance contracts for the purposes of Alabama insurance regulation, [the defendants] were not required by Alabama law to become authorized insurers before they collected money for their product, and neither a representation that they were so authorized nor a failure to disclose that they were not can support a claim of fraud.

Id. at 6. Alabama's laws regulate the business of insurance, not insurance as a general matter, because regulating insurance in the broad sense would entail regulating a number of trivial and often one-time agreements that do not involve the reallocation of loss.

The service contracts in the instant case are similar to those discussed in Schoepflin. Sears apparently offers more than one type of coverage, a standard agreement and a "Confidence Plus Plan." The service contracts require Sears to repair damage to merchandise, if possible, and give a plaintiff a comparable replacement if repair is impracticable. The service contracts provide "Limitations on Coverage." There are, however, no stated procedures for the filing of claims. Nonetheless, and most importantly, the effective purpose of the service contracts is to require Sears to assume, in exchange for the payment of a sum by the plaintiffs, "particular risks of the [plaintiffs]." Id. at 911.

While Sears's service contracts, therefore, fall into the broad concept of insurance discussed in Scheopflin, capable of providing the basis of an Alabama tort law claim, it is not the case that they are part of a business of insurance regulable by Alabama insurance law. First, the service contracts explicitly provide that one of the ways in which Sears will guard against loss due to breakage is by annual examination of the product covered by the contract, attempting to prevent the possibility of loss rather than compensating for loss when it occurs. Second, the plaintiff has not done anything to demonstrate that the cost of the contracts go into a general fund from which indemnification is paid; instead, it appears as though Sears is itself required to repair any damage to the products covered. Loss is prevented, then, by the insurer's own efforts at repair. Finally, the court notes, repair and replacement of damaged merchandise by Sears will be accomplished with Sears's own products. Income to Sears from the service contracts will derive, at least in part, from these implicit sales. Therefore, the plaintiffs cannot state any misrepresentation claims based upon the Alabama insurance laws. The motion for summary judgment with respect to these claims will be GRANTED.

The matter is not so clear with respect to the claims based upon the Mini-Code. However, the court need not resolve the issue, because the service contracts were properly included as an amount to be

8

financed in the finance agreements entered into by the plaintiffs.

AMOUNT FINANCED.

Regardless of whether the service contracts are contracts for insurance, the costs of the service contracts were properly included as amounts financed rather than as finance charges in the finance agreements because Sears did not require the plaintiffs to enter into the service contracts as a prerequisite to the extensions of credit. The plaintiffs agree that they were not required by Sears to enter into the service contracts, but argue instead that the type of insurance provided in the service contracts is not the type of insurance permissibly characterized as a finance charge under § 5-19-20 of the Alabama Code.

As the court in <u>Mitchell v. Ind. Credit Corp.</u>, 898 F. Supp. 1518, 1525 (N.D. Ala. 1995) observed, even if the insurance provided is not of a type listed in § 5-19-20, the inclusion of the insurance as an amount financed is permissible if the insurance is not imposed as an "incident to the extension of credit." Given, first, that the service contracts were made available by Sears not only to those seeking to secure credit, but to those paying for merchandise with cash and, second, that those seeking credit were not required to enter into any service contract as a precondition to the extension of credit, the court cannot conclude that the service contracts were entered into incident to the extensions of credit.

Because all of the plaintiffs' claims based on the Alabama Mini-Code depend upon alleged mischaracterization of the service contracts as part of the amount financed, those claims of the plaintiffs will be DISMISSED.

## Conclusion

For the forgoing reasons, the defendant's motion for summary judgment will be GRANTED. The plaintiffs' claims will be DISMISSED, with prejudice.

This 30 day of September 1998.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE